FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

02 DEC 23  PH 3: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MARJORIE J. HUTTO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 02-JEO-0744-S |
| | ) | |
| PRECISION DOOR SERVICE, INC., | ) | |
| A SECOND OPINION, INC., | ) | |
| BELLSOUTH ADVERTISING & | ) | |
| PUBLISHING CORPORATION, | ) | |
| THE BERRY COMPANY, | ) | |
| BELLSOUTH TELECOMMUNICATIONS, | ) | |
| INC., BRIAN D. TINDALL, RONALD | ) | |
| WAYNE BOYTER, CLAUDE BENJAMIN | ) | |
| MARTIN, JOSEPH DODI, and JAMES | ) | |
| WELLBELOVED, | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED
DEC 23 2002

### MEMORANDUM OPINION

This matter is before the undersigned magistrate judge on the motion of Defendants

Precision Door Service, Inc., Brian D. Tindall, Ronald Wayne Boyter, Claude Benjamin Martin,

Joseph Dodi, and James Wellbeloved ("the Precision Door Defendants"), to dismiss this action

or, in the alternative, to compel the plaintiff, Marjorie J. Hutto ("the plaintiff" or "Hutto"), to

submit her various claims against the defendants to binding arbitration pursuant to the Federal

Arbitration Act ("FAA"). (Doc. 3). The motion is opposed by the plaintiff. (Doc. 13 & 23).

The plaintiff previously requested that the proceedings be stayed to afford the parties an

opportunity to participate in non-binding mediation. (*Id.*). For the reasons set forth herein, the

court finds that the motion to the extent it seeks dismissal of this action is due to be granted

without prejudice to the parties' right to reopen this matter for enforcement purposes. To the

extent it seeks to have this court compel the plaintiff to participate in binding arbitration it is also

31

due to be granted.  The court further finds that the defendants' motion to stay is moot as to the Precision Door Defendants.

## BACKGROUND

The plaintiff filed the present complaint on February 19, 2002, in the Circuit Court of Jefferson County, Alabama.  (Doc. 1).  She alleges various claims against the defendants as a result of certain business transactions.  The action was removed to this court on March 25, 2002, premised on diversity jurisdiction.  (Doc. 2).

On April 1, 2002, Precision Door filed the present motion to dismiss the complaint or to compel binding arbitration.  (Doc. 3).  It alleges that the plaintiff executed a Franchise Agreement that included an arbitration clause which requires the parties to submit any dispute arising out of or in connection with the agreement to arbitration.  (*Id.*).  The plaintiff opposes arbitration, asserting (1) that the agreement containing the provision at issue does not substantially affect interstate commerce; (2) the agreement unconstitutionally removes her right to a jury trial; (3) that the agreement is unconscionable; and, (4) she was fraudulently induced and coerced into signing the agreement.  (Doc. 13).

### Factual History[1]

According to the affidavits submitted in this matter, the plaintiff was an early investor recruited by Brian Tindall, the President of Precision Door, to participate in its garage door repair business.[2]  On September 28, 1999, she executed an "Area Developer Agreement" with Precision

---

[1] These facts are not necessarily the true facts, but are stated as background to allow a determination of the issues presented by the motion to compel arbitration.

[2] The complaint asserts that Claude Benjamin Martin is the Vice President; Ronald Wayne Boyter is the Operations Manager; James Wellbeloved is the Manager of Franchise Administration, and Joseph Dodi is the Controller/Chief Financial Officer.  (Complaint at ¶¶ 4-7).  She further asserts that all of the individual defendants "actively and intentionally participated in the tortious acts alleged in this complaint, and thus are individually liable for these tortious acts."  (*Id.* at ¶ 8).

Door to market the business in the Greensboro, North Carolina area. Hutto executed a promissory note for this right in the amount of $100,000.00. She opened and developed the Greensboro market with the assistance of her boyfriend's credit. (Hutto Aff. at 1).[3] Although the details are disputed by the parties, the Greensboro market was sold in about September 1999. (Martin Aff. at ¶ 6 & Ex. 2). According to Hutto, she was to receive $162,500.00 from the sale. She was paid $60,000.00 at the closing and the remainder was to be paid in installments. (Hutto Aff. at 1). She complains that she was not provided with substantiation for a $5,000.00 closing fee. (*Id*. at 2). As a consequence of the sale, Hutto was left without work.

At some point in 1999, Tindall told the plaintiff that he was going to issue shares of stock in Precision Door to each of the early "developers." When she approached Tindall after the sale about what she was going to do, he told her that she would not have to work again after the end of the year because she was going to have a substantial return on her stock investment. (Hutto Aff. at 2). She states that she was also told, presumably by Tindall, that she would have to "re-invest" $12,500.00 of her proceeds from the Greensboro sale. She therefore bought into the Birmingham market to protect her chances of recovering the outstanding Greensboro funds. (*Id*.).

Hutto signed a franchise agreement with the defendant for access to the Birmingham market. The lengthy agreement includes an arbitration provision. It provides, in pertinent part, as follows:

> **15.6.  Arbitration.**  Any dispute or claim (a **"Claim"**) arising out of or in connection with this Agreement shall be resolved by arbitration; provided, however, that the Franchisor shall not be required to arbitrate any Claim with respect to the ownership or use of the Marks or the Proprietary Information. The

---

[3] Hutto's affidavit is located at document 24, exhibit 1.

3

arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, and conducted by one or more independent arbitrators who are experienced in franchise matters and have no past or present relationship with either party, appointed as set forth in this Section 15.6.  This arbitration provision will not deprive the Franchisor of any right it may otherwise have to seek provisional injunctive relief from a court of competent jurisdiction.  If proper notice of any hearing has been given, the arbitrator(s) will have full power to proceed to take evidence or to perform any other acts necessary to arbitrate the matter in the absence of any party who fails to appear.  The Franchisee waives any rights it may have to demand trial by jury or to seek punitive damages from the Franchisor. The arbitrator(s) will have no power to (a) stay the effectiveness of any pending termination of this Agreement; (b) assess punitive damages; or (c) make any award that modifies or suspends any lawful provision of this Agreement.  All expenses of arbitration must be paid by the party against whom the arbitrator(s) render a decision.  The award made by the arbitrator(s) shall be final, binding and conclusive on all parties to the arbitration for all purposes.  Judgment upon any award and/or enforcing any order of the arbitrator may be entered by any court of competent jurisdiction.

       **15.6.1.   Initiation of Arbitration.**  In order to initiate an arbitration hereunder, the party wishing to make a Claim (the **"Initiator"**) shall give a written notice of demand for arbitration hereunder (the **"Initial Notice"**) to the other party (the **"Respondent"**) and provide the name of the Initial Arbitrator (as hereinafter defined).

       **15.6.2.   Initial Notice.**  To be valid, the Initial Notice must include the following: (a) a statement of the Claim; (b) a proposed resolution (**"Initial Resolution"**) of the Claim; (c) the name of the arbitrator proposed by the Initiator (the **"Initial Arbitrator"**); (d) the address and phone and facsimile numbers of both the Initiator and the Initial Arbitrator; (e) the date of the Initial Notice; and (f) the signature of the Initiator. The Initial Notice may include other matters as shall be deemed appropriate by the Initiator, but it may not contain any conditions to the effectiveness of the Initial Notice nor any other matter which affects the validity of the Initial Notice.

       **15.6.3.   Response.**  The Respondent is bound to respond to the Initial Notice in writing within 30 days of the Initial Notice (the **"Response"**) or suffer the consequences, as hereinafter defined.  If the Respondent fails to timely respond with a valid Response, the Initial Resolution shall become effective as an arbitration award hereunder.  A valid Response must be one of the following (as described more fully below): (a) a Second Notice; (b) Dispute of the Initial Resolution; or (c) Acceptance.

       **A.   Dispute of Resolution and Additional Arbitrators.**

4

If the Respondent wishes to dispute the Initial Resolution and have a panel of three arbitrators, the Respondent must timely deliver a written notice (the **"Second Notice"**) to the Initiator and the Initial Arbitrator, which to be valid, must include the following: (a) a statement of the Response, including the factual disputes with the Initial Notice, and other facts supporting the Respondent's position; (b) a proposed resolution (**"Second Resolution"**) of the Claim, such as alternative amounts of payment or damages or alternative resolutions of the claim; (c) the name of the arbitrator proposed by the Respondent (the **"Second Arbitrator"**); (d) the address and phone and facsimile numbers of both the Respondent and the Second Arbitrator; (e) the date of the Response; and (f) the signature of the Respondent. The Response may include other matters as shall be deemed appropriate by the Respondent, including Counterclaims (defined below) of the Respondent, but it may not contain any conditions to the effectiveness of the Response nor any other matter which affects the validity of the Response. If a valid Second Notice is timely given, the Second Arbitrator and the Initial Arbitrator shall meet and agree on a third arbitrator. If they do not or cannot within 30 days following the Response, then the Initiator, the Respondent and/or either Arbitrator may request to have the Maricopa County Superior Court name the third arbitrator. Upon completing the panel of arbitrators, the panel shall commence the arbitration process. The Arbitrators shall make an award of the Initial Resolution or the Second Resolution or such other award as the Arbitrators decide is just under the facts and applicable law, subject to the terms of this Agreement.

> **B.   Dispute of Resolution and Acceptance of Single Arbitrator.** The Respondent may choose to accept the Initial Arbitrator as the sole Arbitrator and only dispute the Initial Resolution. If the Respondent selects this alternative, the Respondent must timely file a Response including the following: (a) a statement that the Respondent accepts the Initial Arbitrator as the sole arbitrator; (b) a statement of the Response, including the factual disputes with the Initial Notice and other facts supporting the Respondent's position; (c) a proposed Second Resolution of the Claim, such as alternative amounts of damages or alternative resolutions of the Claim; (d) the address and phone and facsimile numbers of the Respondent; (e) the date of the Response; and (f) the signature of the Respondent. The Response may include other matters as shall be deemed appropriate by the Respondent, including Counterclaims of the Respondent, but it may not contain any conditions to the effectiveness of the Response nor any other matter which affects the validity of the Response. If a Response does not name the Second Arbitrator, the Initial Arbitrator shall make an award of the Initial Resolution or the Second Resolution or may schedule a hearing on the issues and make such award as the Initial Arbitrator deems just under the facts and applicable law, subject to the terms of this Agreement.

> **C.   Award.** If the Respondent fails to timely give a valid

5

Response, as provided above, or if the Respondent gives a notice of Acceptance of the Initial Resolution, the Initial Arbitrator shall enter the award adopting the Initial Resolution.

(Hutto Aff., Ex. 4 at ¶¶ 15.6, 15.6.1, and 15.6.2).  Precision Door then applied $80,000.00 of the amount owed Hutto to the purchase price for the Birmingham franchise.  The remaining $20,000.00 was to be paid as weekly royalties.  (Hutto Aff. at 3).

According to the plaintiff's brief, to begin the operation, Hutto ordered Yellow Pages advertisements for the market through Defendant A Second Opinion, Inc. ("Second Opinion").  According to the plaintiff, Second Opinion and/or its owners are or were franchisees or owners of Precision Door.  (Doc. 24 at 3).  Second Opinion "negotiates a nationwide or regional pricing scheme for the advertisements from one or more of the BellSouth codefendants and then Hutto and other franchisees are charged retail cost for the ads by" Precision Door.  (*Id.*).  When the Birmingham adds were ready, they were unacceptable.  Hutto states that she was assured by representatives of Second Opinion and Precision Door that the problem would be taken care of.  She did not pay the costs of the adds due to the representations.  Due to some litigation between BellSouth and Precision Door, BellSouth purportedly informed Precision Door that unless the invoices were paid, Precision Door would not be allowed to advertise in the BellSouth directory.  (*Id.* at 4).  Precision Door then began "aggressive attempts" to collect the outstanding advertising costs.  (*Id.*).  Hutto's invoice was approximately $30,000.00.  She was unable to obtain the funds.  Precision Door then threatened to terminate the franchise agreement.  Ultimately, her franchise was terminated due to her default on the payment of advertising assessments.  (*Id.*).

The Birmingham franchise grew and was successful.  Hutto states that she did not share in the profits as promised.

Effective November 1, 2001, the agreement changed the applicable law from Phoenix, Maricopa County or Arizona to Melbourne, Brevard County or Florida. (Doc. 24, Ex. 7). Premised on the pleadings of the parties and the record, the court finds that Florida law controls on the substantive state law issues. *See e.g.,* Plaintiff's Supplemental Reply Brief. (Doc. 24 at 5).

### THE FEDERAL ARBITRATION ACT

The FAA establishes a "federal policy favoring arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). It provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA effectively admonishes the federal courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). Questions of arbitrability must be addressed with regard to the federal policy favoring arbitration, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a defense to arbitrability." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24-25. Notwithstanding this strong federal policy, however, ". . . arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T Technologies, Inc. v. Communication Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). As a general rule, therefore, "the party's intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985).  Whether an arbitration provision is enforceable, as opposed to the merits of the underlying dispute, is a question for the court.  *Dean Witter*, 470 U.S. at 218.

Although the FAA does not create independent federal question jurisdiction (*Moses H. Cone Memorial Hospital*, 460 U.S. at 25, n.32), it does create a body of federal substantive law which establishes and regulates the duty to honor an agreement to arbitrate.  The FAA explicitly requires that the arbitration provision be written, and that it evidence a "transaction involving commerce."  9 U.S.C. § 2.  Section 3 of the Act provides for a stay of federal proceedings when an issue in the matter is referable to arbitration.  9 U.S.C. § 3.  Section 4 provides the court with the authority to issue orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement.  9 U.S.C. § 4.  Further, state law that conflicts with the FAA is preempted under the Federal Constitution's supremacy clause.  U.S. Const. art. VI, clause 2; *Perry v. Thomas*, 482 U.S. 483, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987).

## DISCUSSION

### Interstate Commerce

In her initial opposition to the motion (doc. 13 at 2), the plaintiff asserts that the defendant has "failed to produce evidence that the contract made the basis of this action substantially effects interstate commerce such that the FAA applies.  The underlying contract is a territorial agreement specifically related to and to be preformed within the state of Alabama." (*Id.*).  There is no further argument or authority offered for this position in her pleadings.

In *Clayton v. Woodmen of World Life Ins. Soc.*, 981 F. Supp. 1447, 1449 (M.D. Ala. 1997), the court stated:

In *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995), the Supreme Court established the framework for determining whether a contract involves interstate commerce for purposes of the FAA. The Court found that, in enacting the FAA, Congress intended to exercise its commerce power to the full extent of the Commerce Clause. *Id*. at 274, 115 S. Ct. at 839-40. Furthermore, the Court held that the phrase, "a contract evidencing a transaction involving commerce," contained in 9 U.S.C. § 2, requires only "that the 'transaction' in fact 'involve' interstate commerce," and does not require that the parties "contemplate an interstate commerce connection." *Id*. at 281, 115 S. Ct. at 843.

In the present case, the record more than adequately demonstrates the interstate connection. Precision Door is an Arizona corporation and was originally located in Arizona, before moving to Florida. The franchises involved in this litigation were located in Greensboro, North Carolina, and Birmingham, Alabama. The plaintiff in her supplemental affidavit states that during 1998 she ran Precision Door's nationwide parts department. Advertising was accomplished through National Yellow Pages directories. The auditor's report for 1999 states that Precision Door "is a fanchisor of garage door repair services franchises throughout the United States." (Martin Aff., Ex. 6 at p. 8). Under these circumstances, and absent any other showing by the plaintiff, the court finds that the FAA is applicable.

### Fraud in the Inducement

Hutto asserts that she was "fraudulently induced and coerced under duress to execute" the agreement containing the arbitration clause at issue on this motion. (Doc. 24 at 6). Specifically, she states that she was promised a share of the profits but Precision Door refused to pay her what she was owed from the Greensboro sale. (*Id*.). She further states that Precision Door failed to declare dividends on the stock to entice her to execute the agreement. (*Id*.).

Florida law provides:

"It is well established that a dispute must be arbitrated where a complaint

9

alleges fraud seeking to avoid or invalidate an entire agreement, rather than just the arbitration clause contained within the agreement. *See Passerrello v. Robert L. Lipton, Inc.*, 690 So. 2d 610, 611 (Fla. 4th DCA 1997); *Alphagraphics Franchising, Inc. v. Stebbins*, 617 So. 2d 463, 464 (Fla. 4th DCA 1993); *Ronbeck Constr. Co. v. Savanna Club Corp.*, 592 So. 2d 344, 347 (Fla. 4th DCA 1992); *Manning v. Interfuture Trading, Inc.*, 578 So. 2d 842, 843 (Fla. 4th DCA 1991); *Medident Constr., Inc. v. Chappell*, 632 So. 2d 194, 195 (Fla. 3d DCA 1994). It is only where the complaint specifically challenges the arbitration clause that a trial court is permitted to determine the validity of the arbitration clause before submitting the remainder of the dispute to arbitration. *See Chappell*, 632 So. 2d at 195.

*Simpson v. Cohen*, 812 So. 2d 588, 590 (Fla. 4th D.C.A. 2002). In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 406, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967), the United States Supreme Court stated:

> . . . if the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the "making" of the agreement to arbitrate--the federal court may proceed to adjudicate it. [ ] But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. . . . We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

It is evident from the plaintiff's response that she is challenging the defendants' conduct concerning the entire agreement and not just the arbitration clause. Therefore, that issue is not appropriate for review at this juncture.

### Unconscionability

The plaintiff also states that "the arbitration clause at issue is unconscionable and therefore unenforceable." (Doc. 24 at 6). The defendants claim that the contract is not unconscionable.

As already stated, when considering whether an arbitration clause in a contract is valid, the court may inquire only into "those issues relating to the making and performance" of the arbitration clause itself and not into claims regarding the enforceability of the contract in general. *Prima Paint Corp.*, 388 U.S. at 404. There must be evidence that the arbitration clause, standing apart from the whole agreement, is not enforceable. *See Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986). Allegations of unconscionability as a whole are to be resolved in arbitration. *Coleman*, 802 F.2d at 1352; *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). *See also Chastain v. The Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) ("Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. . . . Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. . . . Because the making of the arbitration agreement *itself* is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests." (footnote and citations omitted)(italics in original)).

As noted by Judge Thompson in *Rollins, Inc. v. Foster*, 991 F. Supp. 1426, 1431 (M.D. Ala. 1998):

> . . . § 2 of the FAA prohibits the enforcement of an arbitration clause that is invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. In construing this section, the Supreme Court has stated that it "gives States [ ] method[s] for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision." *Allied-Bruce Terminix v. Dobson*, 513 U.S. 265, 280-82, 115 S. Ct. 834, 843, 130 L. Ed. 2d 753 (1995). It is a cardinal principle of federal arbitration law that "arbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648 (1986) (*quoting United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 583-84, 80 S. Ct. 1347, 1353, 4 L. Ed. 2d 1409 (1960)).

However, the Supreme Court held in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270 (1967), that, while a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit, § 4 permits a federal court to hear only claims involving fraud in the inducement of the arbitration clause itself and not claims of fraud in the inducement of the contract as a whole or generally; *Prima Paint's* mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator. "Courts consistently have . . . held that issues relating to the making and performance of a contract as a whole, not specific to the arbitration clause or agreement, should be heard by the arbitrator." *Rainbow Investments, Inc. v. Super 8 Motels, Inc.*, 973 F. Supp. 1387, 1389 (M.D. Ala. 1997) (Thompson, J.)

While *Prima Paint* dealt only with the validity of a contract in light of fraudulent inducement claims, the same principal applies to other challenges to an arbitration clause, such as those based on allegations of forgery, mutual mistake, unconscionability, and impossibility. *See, e.g., Coleman v. Prudential Bache Sec., Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986) ("Claims alleging unconscionability, coercion, or confusion in signing the agreement generally should be determined by an arbitrator because those issues go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement.") (citations omitted); *see also Benoay v. Prudential-Bache Sec., Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986); *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). Thus, § 4 permits a federal court to hear only claims involving forgery, mutual mistake, unconscionability, and impossibility as to the arbitration clause itself and not claims of forgery, mutual mistake, unconscionability, and impossibility as to the contract as a whole or generally.

Hutto's claims, to the extent that they challenge the entire agreement, are not properly before the court. In determining whether the arbitration clause in question is itself unconscionable, the Florida courts have stated that to show that an arbitration clause is unconscionable, it must be found to be both procedurally unconscionable and substantively unconscionable. *Powertel, Inc., v. Bexley*, 743 So. 2d 570, 574 (1st D.C.A. Fla. 1999). The court

12

further stated:

> The procedural component of unconscionability relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms. For example, the court might find that a contract is procedurally unconscionable if important terms were "hidden in a maze of fine print and minimized by deceptive sales practices." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965). In contrast, the substantive component focuses on the agreement itself. As the court explained in *Kohl v. Bay Colony Club Condominium, Inc.*, 398 So. 2d 865, 868 (Fla. 4th DCA 1981), a case is made out for substantive unconscionability by showing that "the terms of the contract are unreasonable and unfair."

*Bexley*, 743 So. 2d at 574.

## Procedural Unconscionability

On the first prong, Hutto asserts that the agreement is procedurally unconscionable because she lacked a meaningful choice as to the terms and because the provision was not conspicuous. The record, however, is silent on the first assertion. Hutto does not state what efforts, if any, she made to alter the terms of the agreement. There is no evidence that it was presented on a "take it or leave it" basis. Additionally, nothing precluded her from pursuing her available legal remedies following the sale of the Greensboro franchise. Entering the new agreement was not her only recourse.

In support of her assertion that the terms were inconspicuous, particularly "the critical waiver of her right to trial by jury" (doc. 24 at 8), the court does not agree. The Franchise Agreement lists the arbitration provisions in the Table of Contents. (*See* Martin Aff., Ex. 4, pp. iv-v).[4] As noted by Precision Door, the print size and font for the arbitration provisions are the

---

[4] The Table of Contents provides:

| 15.6 | Arbitration | 22 |
| | 15.6.1 Initiation of Arbitration | 22 |
| | 15.6.2 Initial Notice | 22 |

same as the other provisions of the agreement.  The provisions cover two pages of the agreement (almost 10 percent thereof).  These provisions were not hidden or disguised.  Additionally, it is clear that the plaintiff signed a similar agreement, containing an arbitration provision, when she purchased the Greensboro franchise.  (Martin Aff., Ex. 8 at ¶ 16).  The plaintiff's argument that the waiver of her right to a jury trial was not conspicuous (doc. 24 at 8) is not persuasive on this issue.  Although portions of the section regarding the fact that no other representations beyond those expressly made in the agreement are in capital letters, that is not availing.  In fact, it emphasizes the importance of reading the terms and conditions specified in the agreement.

The plaintiff principally relies on *Bexley* and *BellSouth Mobility LLC v. Christopher*, 819 So. 2d 171, 172 (Fla. 4th D.C.A. 2002), in support of her assertions.  This reliance, however, is misplaced in that these cases are factually and legally distinguishable.  In *Bexley*, the plaintiff purchased a cellular telephone service plan from the defendant.  She asserted that she was wrongly billed $4.50 in long distance service.  She filed suit on her behalf and on behalf of a purported class of customers who were wrongly charged additional fees.  The day after her suit was filed, she received another bill in the mail, which included a pamphlet adding a new provision relating to resolution of disputes through arbitration that was not in her original terms and conditions.  The defendant moved to compel arbitration, which was denied by the trial court.  The defendant appealed that determination.  The appellate court affirmed the trial court, finding

---

        15.6.3    Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                  A.    Dispute of Resolution and Additional Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . 22
                  B.    Dispute of Resolution and Acceptance of Single Arbitrator . . . . . . . . . . . . . . . . 23
                  C.    Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        15.6.4    Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        15.6.5    Individual Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

(Martin Aff., Ex. 4 at iv-v).

14

that the arbitration clause was unconscionable and therefore unenforceable. Applying the unconscionability test outlined above, the court found that the defendant prepared the arbitration clause unilaterally and sent it to its customers as an insert to their monthly bill. Because "the customers had no choice but to agree to the new arbitration clause if they wished to continue to use the cellular telephone plans," the court found it was procedurally unconscionable. *Bexley*, 743 So. 2d at 574-75. The court was bothered by the fact that although the plaintiff could switch providers, that would result in a loss of the investment the customers already had in the plan. *Id.* at 575. The court was further troubled by the fact that the pamphlet gave insufficient notice of the important change it contained. *Id.* On the matter of substantive unconscionability, the court stated that the agreement required the customers to give up substantial legal rights, including the right to recover punitive damages; caused them to waive important statutory remedies; and effectively removed the defendant's "exposure to any remedy that could be pursued on behalf of a class of consumers." *Id.* at 576. The court did not find that the remedies available under the agreement were equivalent to what were available in the courts. *Id.* Finally, the court was troubled by the fact that the arbitration clause was added in the amended terms and conditions of the service plan after the plaintiff filed her suit. *Id.* at 577.

The plaintiff's reliance on *Christopher* is also misplaced. In *Christopher*, the plaintiff filed an action seeking class certification to challenge BellSouth's allegedly overcharging customers for wireless telephone service. The trial court denied BellSouth's motion to compel, finding that it was unconscionable because Christopher had no true ability to bargain, it was not practical for him to seek another service provider, and it prevented him from seeking punitive damages, injunctive or declaratory relief, or class relief. *Id.* at 173. Remanding the case, the

appellate court stated:

> The contract on its face supports that the arbitration clause is, at a minimum, substantively unconscionable because it requires customers to give up many specific legal remedies. For instance, it expressly limits BellSouth's liability to actual damages, even if its conduct rises to the level of outrageousness required to assess punitive damages. It also expressly removes BellSouth's exposure to a class action suit which, in this case, may be warranted due to the numerosity of the small claims asserted, the common questions of law and fact raised by the claims, the typicality of the claims, and Christopher's status as a fair representative of the class. *See* Fla. R. Civ. P. 1.220(a) (discussing the prerequisites to class representation). Moreover, the substance of the arbitration provision seems unduly unfair.
>
> Although customers are bound to arbitration, BellSouth still has the option of pursuing court action in some instances, including the collection of a debt. In short, the clause gives BellSouth an unfair advantage.
>
> We are precluded from affirming, however, because there was no evidence presented as to whether Christopher bargained for this provision and knowingly gave up these rights. There likewise was no evidence to support the trial court's findings as to unavailability, or difficulty in obtaining, competing services, or transferring phone numbers, equipment and so on. The trial court made determinations which, although they seem to make sense, are not supported by record evidence. We hold an evidentiary hearing is, thus, required.

*Christopher*, 819 So. 2d at 173.

These cases involve consumer disputes, which, but for the prospect of class certification and specific statutory regulation, would not be prosecuted due to the small amounts involved in individual litigation. The present case is distinguishable. The amount in dispute is substantial. Additionally, unlike the situation in *Bexley*, the defendant did not change the terms of the agreement after she executed the same. The plaintiff had sufficient notice of the terms and conditions. Nothing in the record demonstrates that the plaintiff did not possess the wherewithal to understand and appreciate the significance of what she was signing.

16

## Substantive Unconscionability

The plaintiff asserts that the arbitration clause is substantively unconscionable because the terms are unreasonable and unfair for a number of reasons, including: (1) it prohibits punitive damages and class actions; (2) Precision Door is not required to arbitrate certain claims; (3) Precision Door is not prohibited from seeking injunctive relief while the plaintiff cannot; (4) that the arbitrator cannot make "any award that modifies or suspends any lawful provision of the Franchise Agreement;" (5) that all expenses must be paid by the non-prevailing party, thus dictating the arbitrator's authority; (6) that the agreement preempts the appeals process provided for in the FAA; (7) that the agreement provides no information regarding fees; (8) that the agreement provides no information on the rules or procedures to be used beyond a terse reference to the rules of the United States Arbitration Act; (9) that the agreement improperly limits the time for counterclaims; and (10) that the venue provisions are unreasonable in that they require that the arbitration be conducted outside the jurisdiction of the occurrence and out of the state and region where the franchise was located.  (Doc. 24 at 8-9).

The court does not find the fact that the agreement in this case precludes the arbitrator from awarding punitive damages sufficient to make it unenforceable.  *See Investment Partners, L.P. v. Glamour Shots Licensing, Inc.*, 298 F.3d 314, 318 n.1 (5th Cir. 2002) ("Provisions in arbitration agreements that prohibit punitive damages are generally enforceable.  *See e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 46-57, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995).").  Similarly the fact that the agreement precludes class actions does not make it unenforceable.  *See Randolph v. Green Tree Financial Corp.--Alabama*, 244 F.3d 814, 819 (11th Cir. 2001) ("we hold that a contractual provision to arbitrate TILA claims is enforceable even if

17

it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA.").

To the extent that the plaintiff complains that Precision Door is not required to arbitrate certain claims and that it has the right to seek injunctive relief while she does not, the court notes that although she is correct, these provisions do not otherwise vitiate the agreement to arbitrate. First, the exclusions are limited and only apply "with respect to the ownership or use of the marks or the Proprietary Information." (Martin Aff., Ex. 4 at ¶ 15.6). Second, the provision allowing for injunctive relief is very limited and necessary to avoid irreparable injury to Precision Door and other franchisees.[5] (*Id.* at ¶ 15.4).

To the extent that the agreement states that the arbitrator cannot make "any award that modifies or suspends any lawful provision of the Franchise Agreement," the court does not find this provision problematic. In sum, it requires the arbitrator to follow applicable law.

To the extent that the agreement states that the expenses of the arbitration are to be paid by the losing party, the agreement is enforceable. The plaintiff has cited no authority showing that such a provision, especially when read in the context of the entire agreement, is inappropriate. The provision was not hidden in the agreement and placed all parties on notice of its application.

---

[5] The agreement provides:

> 15.4. <u>Injunctive Relief</u>. The Franchisee recognizes that he is a member of a franchise network and that his acts or omissions may have a positive or negative effect on the success of other businesses operating under and in substantial association with the Franchisor's Marks. Failure on the part of a single franchisee to comply with the terms of a franchise agreement is likely to cause irreparable damage to the Franchisor and to some or all of the other franchisees of the Franchisor. For this reason, the Franchisee agrees that if the Franchisor can demonstrate to a court of competent jurisdiction that there is a substantial likelihood of a breach or threatened breach of any of the terms of this Agreement by the Franchisee, the Franchisor will be entitled, without posting of a bond, to an injunction restraining the breach and/or to a decree of specific performance, without showing or proving any actual damage, until a final determination is made in arbitration.

(Martin Aff., Ex. 4 at ¶ 15.4).

18

To the extent that the plaintiff asserts that the agreement preempts the appeals process under the FAA, the court does not find this argument sufficient to preclude enforcement. The agreement provides that the arbitrator's award "shall be final, binding, and conclusive on all parties to the arbitration for all purposes." (Martin Aff., Ex. 4 at ¶ 15.6). The FAA provides that an appeal may be taken from "a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3). The agreement refers to appeals in the "Attorneys' Fees" section when it states that a party may recover its reasonable costs and expenses, including costs for an appeal. (Martin Aff., Ex. 4 at ¶ 15.7). Thus, this court does not find that an appeal under the FAA is prohibited by the agreement. Even if the court assumes for the sake of argument that the agreement waives a party's right of appeal, the plaintiff has not demonstrated any authority that precludes such.

The plaintiff next asserts that the arbitration agreement is not enforceable because it contains ambiguous terms and creates "surprise" with regard to fees and procedures. (Doc. 24 at 9). In the first *Randolph* case, *Randolph v. Greentree Financial Corp.*, 178 F.3d 1149 (11th Cir. 1999), the arbitration agreement was lengthy, but did not include any reference to the payment of filing fees, arbitrators' costs or what rules would be applicable. The Eleventh Circuit Court of Appeals held that the agreement "fails to provide the minimum guarantees required to ensure that Randolph's ability to vindicate her statutory rights will not be undone by steep filing fees, steep arbitrators' fees, or other high costs of arbitration." *Id.*, 178 F.3d at 1158.

The United States Supreme Court reversed in part the decision of the Eleventh Circuit in *Randolph*, holding that the agreement's failure to mention costs and fees does not make it per se unreasonable. The Supreme Court cited the strong federal policy favoring arbitration underlying

19

the FAA "'to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements on the same footing as other contracts.'" *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 89, 121 S. Ct. 513, 521, 148 L. Ed. 2d 373 (2000), *citing Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991).  The Court stated that to invalidate the agreement premised on the plaintiff's claim that the absence of any terms on costs and fees creates the "risk" that she incur prohibitive costs and thereby forces her to abandon her claims is "too speculative to justify the invalidation of an arbitration agreement." *Id.*, 531 U.S. at 91, 121 S. Ct. at 522.  The Court further stated that "[t]o invalidate the agreement on that basis would undermine the 'liberal federal policy favoring arbitration agreements'" (*id., citing Moses H. Cone Memorial Hospital*, 460 U.S. 24, 103 S. Ct. 927) and "[i]t would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." (*id., citing Gilmer*, 500 U.S. at 25).  Lastly, the Court stated that the determinative questions were (1) "whether the parties agreed to submit their claims to arbitration," and (2) "whether Congress has evidenced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."[6] *Randolph*, 531 U.S. at 90, 121 S. Ct. at 521.

The agreement Precision Door seeks to enforce clearly states that the parties (Hutto and Precision Door) intended for any disputes between them other than those related to the ownership or use of trademarks, copyrights, and propriety information be subject to arbitration. (Martin Aff., Ex. 4 at ¶ 15.6).  It further states the arbitration is to be governed by the United States Arbitration Act.  (*Id.*).  It also states that expenses will be paid by the losing party.  (*Id.*).

---

[6] *Randolph* involved a claim under the Truth in Lending Act.

20

Another provision provides that a prevailing party may recover reasonable attorneys fees and costs. (*See* ¶ 15.7). A fair reading of the agreement makes it clear that the parties agreed to arbitrate their disputes, including the present matter before an independent arbitrator with experience in franchise matters. (*Id.* at ¶ 15.6). Although the agreement does not specify the fees or enumerate the specific rules that are applicable to this dispute, that is insufficient to overcome the federal policy favoring arbitration.

To the extent that the plaintiff complains that she must comply with Federal Rule of Civil Procedure 13, dealing with counterclaims, the court notes that both Hutto and Precision Door would be subject to this requirement. (*Id.* at ¶ 15.6.4). Such a limitation is not unreasonable.

Finally, to the extent that the plaintiff complains that the venue provisions in the agreement are unfair and unreasonable, the court disagrees. Again, counsel has cited no authority or facts warranting such a conclusion. Additionally, the plaintiff was aware of the venue provisions prior to signing the agreement.[7]

The record before this court does not warrant a finding that the agreement is unenforceable premised on substantive unconscionability. In light of the Supreme Court's decision in *Randolph*, this court further finds that the plaintiff's challenges to the agreement are not sufficient to preclude enforcement of the same by the Precision Door Defendants.[8]

---

[7] When the agreement was amended in 2001 to change the applicable law from Phoenix, Maricopa County or Arizona to Melbourne, Brevard County or Florida, the situs of any arbitration was in fact moved closer to where the relevant conduct occurred. (Martin Aff., Ex. 5).

[8] The Eleventh Circuit Court of Appeals has held that a nonsignatory to a contract, such as the individual Precision Door Defendants herein, have a right to enforce an arbitration clause as well as a signatory in limited circumstances. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). A nonsignatory may enforce an arbitration agreement when under agency or related principles, the relationship between signatory and nonsignatory defendants is such that only by allowing the nonsignatory to require arbitration may the underlying agreement be preserved. *Franklin*, 177 F.3d at 947. The court finds that arbitration is due to be ordered as to all the claims against the Precision Door Defendants. The plaintiff's terse argument, which is not supported by any authority, that the agreement is limited to only Precision Door, is not persuasive under the circumstances. The court's order compelling arbitration and staying this action as to the Precision Door Defendants does not include the other

21

## CONCLUSION

Premised on the foregoing, the court finds that the Precision Door Defendants' motion to dismiss and, in the alternative, for an order compelling arbitration and to stay further proceedings as to them (doc. 3) is due to be granted without prejudice to the parties' right to reopen this matter for enforcement purposes and to the extent it seeks to have this court compel the plaintiff to participate in binding arbitration. The court further finds that the defendants' motion to stay is moot as to the Precision Door Defendants. The plaintiff shall initiate said arbitration pursuant to the Franchise Agreement within 90 days. An order consistent with these findings will be entered.

**DONE,** this the _280_ day of December, 2002.

_[signature]_

**JOHN E. OTT**
United States Magistrate Judge

---

original defendants (A Second Opinion, the BellSouth Defendants, and The Berry Company (L.M. Berry and Company)) that have already been dismissed.